IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:11-cr-156-MEF |
| | ) | [WO – Publish] |
| JOSE DEL REFUGIO | ) | |
| PALOMAR-MARTINEZ | ) | |

## MEMORANDUM OPINION

This Defendant, Jose Del Refugio Palomar-Martinez, appeared before the Court for his illegal reentry sentencing hearing as the embodiment of an intricate question: "What does it mean to be American?"  This post-sentencing Memorandum Opinion addresses the legal context in which that question arose at Mr. Palomar-Martinez's April 25, 2012 sentencing hearing. The answer to that question, it appears, is quite simple.

### I.  FACTUAL AND PROCEDURAL BACKGROUND

Mr. Palomar-Martinez is an "American" in *almost* every sense of the word.  Now aged thirty-six years old, Mr. Palomar-Martinez has spent the great majority of his life as a legal resident in the United States.  After receiving legal permanent resident status, his family moved from Piedras Negras, Mexico, a border town on the Rio Grande, to San Antonio, Texas, when Mr. Palomar-Martinez was three years old.  With very few, or even no memories of his place of birth, Mr. Palomar-Martinez grew up living an American life.  He attended American schools, and American English is his first language.[1]  There were no

---

[1]  Like an American foreign-language student, Mr. Palomar-Martinez has endeavored to learn Spanish, and only speaks enough to "get by."

relatives back in Mexico to remind him of his roots, as nearly all of Mr. Palomar-Martinez's family members live in the United States as legal permanent residents or citizens. Like Mr. Palomar-Martinez, they are all quite American themselves. For example, Mr. Palomar-Martinez's brother is a Master Sergeant in the United States Army, and during his twenty-plus years of military service has embarked on numerous tours of duty in Kuwait and Iraq (once in Desert Storm and thrice in Operation Iraqi Freedom), in Afghanistan, and in Panama.

Mr. Palomar-Martinez received his High School Diploma from Edgewood ISD in San Antonio, Texas, in 1995. He studied nursing until 1999, at which point he followed his older brother's example and enlisted in the United States Air Force. He was stationed at Eglin Air Force Base, in Florida. During his two and half years serving America, Mr. Palomar-Martinez trained as an Emergency Medical Technician and commenced training to become a Licensed Vocational Nurse. His superiors valued his work ethic and passion for patient care. However, he was given a general discharge in early 2002 for failing to report and reporting late for duty at his assigned post.[2]

Following discharge, Mr. Palomar-Martinez's life began to unravel. In early 2005, Mr. Palomar-Martinez and his pet bulldog were subject to a traffic stop in Biloxi, Mississippi, because he had no license plate on his vehicle. The officer became suspicious

---

[2] It turns out that Mr. Palomar-Martinez was and still is suffering from a hypothyroid condition which, if untreated, causes extreme weakness and fatigue. This condition likely played a role in Mr. Palomar-Martinez oversleeping on two occasions and failing to report to his post as assigned.

when:  (1) he observed a large scale in the backseat of the vehicle; (2) Mr. Palomar-Martinez was unable to produce any paperwork for the vehicle (which he supposedly was buying); and (3) Mr. Palomar-Martinez concealed that he had previously been arrested for narcotics violations, money laundering, and firearms violations.[3]  The officer's canine alerted to the presence of narcotics, and a search yielded approximately three ounces of cocaine.  Mr. Palomar-Martinez was convicted of possession of a controlled substance with intent to distribute and was sentenced to 15 years custody, which was suspended for 5 years of probation.  More importantly, and unbeknownst to Mr. Palomar-Martinez, the cocaine conviction, as a deportable offense, *see* 8 U.S.C. § 1227(a)(2)(B)(i), affected his ability to reside in the United States, a privilege which Mr. Palomar-Martinez had taken for granted since the age of three.

In early 2007, in Pensacola, Florida, Mr. Palomar-Martinez was stopped for speeding. He did not have a driver's license, because it was suspended, and the license plate did not match the car Mr. Palomar-Martinez was driving.  Furthermore, the officer smelled marijuana, and Mr. Palomar-Martinez appeared nervous and was making suspicious movements to the backseat of his vehicle.  A search turned up a loaded semi-automatic

---

[3]  The arrests in question occurred in Texas and Louisiana in late 2002 and 2003, respectively.  The charge in Texas was Money Laundering of $20,000 to $100,000.  The disposition of the charge is unknown.  The incident in Louisiana involved a 3:00 a.m. traffic stop. Found in Mr. Palomar-Martinez's possession were several ounces of marijuana, three semi-automatic handguns, three mobile telephones, and approximately $50,000 in currency. Inexplicably, the Louisiana charges (possession with intent to distribute marijuana and possession of a firearm with a controlled dangerous substance) were dismissed.

3

handgun (with the serial number removed) in the pouch on the back of the front passenger seat.  The search also yielded six baggies containing marijuana residue, also found in the backseat area.  Mr. Palomar-Martinez was convicted of carrying a concealed weapon and of narcotic equipment use or possession, and he was sentenced to 18 months probation.

As Mr. Palomar-Martinez attempted to renew his legal permanent resident status in early 2008, he was arrested by Immigration and Customs Enforcement ("ICE").  To Mr. Palomar-Martinez's apparent surprise, removal proceedings were initiated and Mr. Palomar-Martinez was deported from the United States in March of 2008.  Mr. Palomar-Martinez discovered, quite harshly, that growing up in America, going to school in America, speaking American English, serving in America's armed forces, or even self-identifying as American, does not make one "American."  Rather, the answer to the question posed above – "what does it mean to be American?" –  is found in the simple and mostly static answer of citizenship.  As Mr. Palomar-Martinez's counsel passionately argued in allocution, citizens who commit crimes like the ones committed by Mr. Palomar-Martinez get to return home when released from prison.

Legal residence in the United States is a prized privilege for many aliens, and our legal system sees it as a flagrant abuse of that privilege when a resident alien comes to the United States and violates its laws repeatedly.  Whatever the arguments may be regarding the propriety of automatic deportability for someone in Mr. Palomar-Martinez's shoes, at the end of the day, Mr. Palomar-Martinez's passport was green, not blue.  And that is the reason for

his deportation to a country wherein he had few meaningful connections.

As if Mr. Palomar-Martinez's life was not complicated enough at this point, his girlfriend with whom he had been co-habiting (an American citizen) was pregnant with a daughter (also an American citizen).  Thus, in that short span of time, Mr. Palomar-Martinez's ties to the United States were both forcibly severed and demonstrably strengthened.

Quite understandably, Mr. Palomar-Martinez was in an untenable position.  His entire family, including his soon-to-be-born daughter and daughter's mother, lived in the United States.  He quickly and illegally reentered.  He was discovered forthrightly, and was charged and convicted in the Northern District of Florida of illegal reentry in the United States after deportation.  He was sentenced to six months custody in the Bureau of Prisons, followed by three years of supervised release.  Mr. Palomar-Martinez was deported again.

This time, however, Mr. Palomar-Martinez afforded Mexico a fighting chance.  He moved to Cancún, Mexico, and became an emergency medical technician, where he likely treated vacationing American citizens.  His girlfriend and daughter joined him, but soon moved back to the United States.  Mr. Palomar-Martinez moved back as well.  His move was a criminal offense.

Mr. Palomar-Martinez found his way to this district by attempting to purchase Oxycodone in Covington County.  In July of 2011, he was arrested for and charged with attempted possession of a controlled substance in Covington County.  That charge remains

pending and Mr. Palomar-Martinez has been in state custody since.  He was charged in the Middle District of Alabama, this Court, for illegal reentry.  As a state prisoner, Mr. Palomar-Martinez was produced on a writ and came before the Court for sentencing on April 25, 2012.  During his own allocution, Mr. Palomar-Martinez stated:  "You asked me . . . if I will come back.  If my little girl needs me, that's – that's it.  Thank you."  The Court denied Mr. Palomar's motion for a downward departure for cultural assimilation and overruled the related objection, but nevertheless imposed a variance sentence of time served.

The purpose of this opinion is to discuss the Court's ruling on Mr. Palomar-Martinez's request for a departure based upon "cultural assimilation."  It is not an attempt to explain holistically the Court's sentence.

## II. DISCUSSION

An addition to the 2010 Sentencing Guidelines, comment 8 to § 2L1.2 provides for a departure based upon cultural assimilation.  In adding this amendment (Amendment 740), the Sentencing Commission noted that several courts of appeals, including the Eleventh Circuit, had previously recognized a sentencing court's authority to depart based upon cultural assimilation.  *See United States v. Sanchez-Valencia*, 148 F.3d 1273, 1274 (11th Cir. 1998) (citing *United States v. Lipman*, 133 F.3d 726, 730 (9th Cir. 1998) (finding authority for cultural assimilation departure under §§ 5K2.0 and 5H1.6)).

The application note to this new Guideline departure states that the departure should be considered only in cases where three conditions are present:

> (A)  the defendant formed cultural ties primarily with United States from having resided continuously in the United States from childhood, (B) those cultural ties provided the primary motivation for the defendant's illegal reentry or continued presence in the United States, *and* (C) such a departure is not likely to increase the risk to the public from further crimes of the defendant.

§ 2L1.2 cmt. 8 (emphasis added).   The commentary note also lists seven additional considerations when contemplating such a departure:

> (1) the age in childhood at which the defendant began residing continuously in the United States, (2) whether and for how long the defendant attended school in the United States, (3) the duration of the defendant's continued residence in the United States, (4) the duration of the defendant's presence outside the United States, (5) the nature and extent of the defendant's familial and cultural ties inside the United States, and the nature and extent of such ties outside the United States, (6) the seriousness of the defendant's criminal history, and (7) whether the defendant engaged in additional criminal history after illegally reentering the United States.

§ 2L1.2 cmt. 8.

In this case, the primary argument centered around Mr. Palomar-Martinez's ability to satisfy condition (C), regarding protecting the public from further crimes of the defendant. As a preliminary matter, defense counsel urged the Court to read conditions (A)-(C) as elaborating a disjunctive balancing test.  In other words, the argument was that Mr. Palomar-Martinez satisfied conditions (A) and (B) to such a degree that the Court need not be entirely convinced as to his ability to satisfy condition (C).  Such a reading contradicts the plain language of the commentary note, which employs the conjunctive "and," and states that it is "only" appropriate in cases where all three conditions are present.  The Sentencing Commission speaks in the same American English spoken by everyone else; thus, the

language employed in the Sentencing Guidelines is to be read in a manner consistent with its plain and ordinary meaning. *See, e.g., United States v. Strachan*, 968 F.2d 1161, 1163 (11th Cir. 1992) ("Moreover, our interpretation is dictated by a wealth of precedent in this circuit that seeks to remain faithful to the plain language of the sentencing guidelines." (citing cases)).  In plain and ordinary English, the use of the word "and" does not indicate a disjunctive test.

Second, the cases on which Defendant relies do not support a disjunctive reading. Defendant's counsel argues that the Eleventh Circuit in an unpublished opinion, *United States v. Francisco*, 432 F. App'x 832 (11th Cir. 2011), implicitly considered the three factors to constitute a disjunctive balancing test.  This Court cannot glean any such implication from the Eleventh Circuit's opinion.  Furthermore, after having reviewed the transcript of the sentencing hearing in *Francisco*, this Court does not believe the district court in *Francisco* engaged in the kind of balancing test advocated by defense counsel.  The Government argued in that case that the defendant did not qualify for the newly-created Guideline departure for cultural assimilation on account of his criminal history.  Specifically, the Government argued: "Counsel's correct that the [Guidelines] provide for departure based on cultural assimilation, but counsel and defendant need to address No. C [sic], that . . . such a departure is not likely to increase the risk to the public for further crimes of the defendant." (Doc. # 35, at 7-8 in SD Fla. Case No. 9:10cr80091DMM).  In refusing to depart, the district court appears to have agreed with the Government's position: "And while I think the cultural

8

assimilation is unfortunate, . . . I don't think a reduction is appropriate given the risk of further criminal activity by Mr. Francisco." (*Id.* at 9.)

A recent unpublished Sixth Circuit opinion cited by Defendant is likewise unhelpful to the disjunctive balancing-test argument. *United States v. Valles-Renteria*, 447 F. App'x 714 (6th Cir. 2012). In that case, the Sixth Circuit considered the seven factors in the disjunctive, but ultimately returned to conditions (A)-(C), and found that the defendant failed to satisfy condition (C): "Defendant failed to establish – either at sentencing or on appeal – that he satisfied *requirement* (C) of the Note, which *mandates* that 'a [cultural assimilation] departure is not likely to increase the risk to the public from further crimes of the defendant.'" *Id.* at 719-20 (emphasis added) (quoting § 2L1.2 cmt. 8).

Having established that Mr. Palomar-Martinez must satisfy the condition or requirement or mandate that he show that such a departure is not likely to increase the public's exposure to further crimes on his part, the Court proceeds to its analysis of that requirement. Factors (6) and (7) of the seven factors appear to be tailored specifically toward this requirement. *Valles-Renteria*, 447 F. App'x at 718-19.

Factor (6) instructs the Court to consider "the seriousness of the defendant's criminal history[.]" § 2L1.2 cmt. 8. Mr. Palomar-Martinez scored in at a criminal history category III. His 2005 and 2007 convictions, described above, are not the youthful antics of a college student, nor are they an addict's attempts to satisfy an addiction. In fact, Mr. Palomar-Martinez stated at sentencing that his primary motivation for getting involved in drugs was

to deal them to make money.  Drug trafficking combined with loaded firearms make for serious crimes and is a dangerous game, both for Mr. Palomar-Martinez and others involved either by design or happenstance.  Furthermore, the nature of the crimes (narcotics trafficking) make it more likely that the public could be exposed to Mr. Palomar-Martinez's criminal activity in the future.  The American public is tangibly injured any time illegal narcotics are imported, sold, or distributed to Americans or on American soil.  Accordingly, factor (6) does not weigh in Mr. Palomar-Martinez's favor.[4]

Factor (7) counsels the Court to evaluate "whether the defendant engaged in additional criminal activity after illegally reentering the United States."  § 2L1.2 cmt. 8.  As stated above, Mr. Palomar-Martinez faces a pending state court charge in Covington County of attempted possession of a controlled substance.  Factor (7) does not weigh in Mr. Palomar-Martinez's favor.

Finally, relevant to requirement (C) is the Court's assessment of whether the Defendant will return to the United States once deported again, the third time for Mr. Palomar-Martinez.  If a court departs for cultural assimilation and that departure results in a lesser sentence, the public is only exposed to further crimes of the defendant if the defendant returns quickly after being deported.  Mr. Palomar-Martinez has twice illegally reentered the United States, both times relatively swiftly after being deported.  Furthermore,

---

[4] At the same time, the Court recognizes that many (indeed most) illegal reentry defendants have a criminal history.  It is other criminal conduct that often leads both to the initial deportation and to the illegal reentry charge.  Accordingly, the Court focuses its inquiry not on the number of convictions, but the conduct underlying those convictions.

Mr. Palomar-Martinez provided some insight into his post-deportation intentions this time around when he stated: "You asked me . . . if I will come back. If my little girl needs me, that's – that's it. Thank you."

All of these considerations collectively weigh against a finding that application of cultural assimilation departure is not likely to increase the risk to the public from further crimes of Mr. Palomar-Martinez. Accordingly, Mr. Palomar-Martinez failed to satisfy requirement (C) for the departure, which was the basis for the Court's decision to deny his motion and overrule his objection at sentencing.

The issue in this case – the "cultural assimilation" departure – offers a contextual window into the escalating public debate concerning persons who reside illegally in this country. It is obvious from the Opinion of this Court that Mr. Palomar-Martinez presents a very difficult case about legal status, and how quickly it can be taken away, leaving the individual severed from almost all of his familial and life connections. As sympathetic as Mr. Palomar-Martinez's current plight may be, this Court cannot, an will not, ignore the conduct Mr. Palomar-Martinez engaged in by his own volition that led him to his current unfortunate situation. Mr. Palomar-Martinez abused a privilege of legal residency and it was taken from him. Citizenship is not a right afforded to every person who finds themselves living legally within this country's borders. As with any privilege, a person's conduct can result in the privilege being taken away. Requests by non-citizens to live in this country legally can be, and routinely are, denied. Defendant's counsel strategically sought to re-

classify Defendant's unfortunate situation as "unfair."   However, the Court reminds Defendant that it was his *own* conduct that led him to his unfortunate set of circumstances. Furthermore, it happens occasionally that "unfairness" and "legal permissibility" tenuously co-exist.  Especially in the context of the criminal laws, this Court is obligated to give greater deference to the latter.

DONE this 2nd day of May, 2012.


/s/ Mark E. Fuller
UNITED STATES DISTRICT JUDGE